IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

LEANNA J. ANDREWS,

      Plaintiff,

v.

MICHAEL J. ASTRUE,
Commissioner of Social
Security,

      Defendant.

No. 09-CV-4024-DEO

MEMORANDUM OPINION AND ORDER
REGARDING COMMISSIONER'S
DENIAL OF BENEFITS

_____

**TABLE OF CONTENTS**

I.   INTRODUCTION AND BACKGROUND . . . . . . . . . . . . . 2

II.  LAW AND ANALYSIS . . . . . . . . . . . . . . . . . 7

III. CONCLUSION . . . . . . . . . . . . . . . . . . . . 22

Leanna J. Andrews seeks disability insurance benefits
(DIB) and supplemental security income benefits (SSI). The
Administrative Law Judge's (ALJ's) July 6, 2007, decision
found her ineligible. Andrews now seeks judicial review of
the ALJ's decision by this Court. The Commissioner seeks
remand of the case to the ALJ for further consideration of
Andrews' claim.

This Court reverses the decision of the ALJ and awards benefits.

## I. INTRODUCTION AND BACKGROUND

Andrews' life can perhaps best be described as tumultuous. Her parents divorced when she was in Kindergarten. Tr. Tr. 214. She has one sister and two brothers, as well as a half-brother given up for adoption at birth. Tr. 214, 310. Shortly after her parents divorced, she and her siblings were removed from her alcoholic mother's custody and placed in a temporary home, only to be returned to her mother, who then sent her and one of her brothers to live with their father and stepmother. Tr. 214, 301. Her sister and her other brother were placed with a maternal aunt. Tr. 214. Andrews reports a family history of drug and alcohol abuse and mental health issues. Tr. 214, 301, 310. One of her brothers is schizophrenic. Tr. 214, 310. She admits she struggled with substance abuse until recently. Tr. 215-16. Andrews experiences auditory hallucinations; she claims she has heard voices in her head since childhood.[1] Tr. 215, 309.

---

[1] Andrews also claims she has experienced visual hallucinations since a very young age. See, e.g., Tr. 217. Regarding the voices in her head, Andrews claims she sometimes hears labored breathing and whispering and a voice calling her name. Id.

She was placed in a state psychiatric hospital for most of her teenage years.[2]  Tr. 215-16, 310, 332, 496.  Her substance abuse began at age thirteen while on the run from her state hospital placement.  Tr. 216, 310.  She eventually developed addictions to alcohol, tobacco, cocaine, and methamphetamine, though she reportedly has abstained from alcohol and illegal drugs since completing chemical dependency treatment in 2003.[3] Tr. 215-16, 310.

Andrews was sexually abused by her father from age five to eleven.  Tr. 214, 301, 310, 510, 521.  She was physically abused by her stepmother, who frequently hit her head and whipped her with a belt, leaving marks.  Tr. 214-15, 310, 521. She also witnessed physical abuse, first between her parents, then later between her father and stepmother.  Tr. 214-15.

Andrews has been married three times.  Tr. 216, 502.  She was physically abused by the father of her three children, who also beat their children.  Tr. 214.  Beatings by an unnamed ex-boyfriend left her hospitalized on more than one occasion.

_____

[2] The record also reflects Andrews was placed in a juvenile detention facility on at least two occasions. See,e.g., Tr. 310.

[3] Andrews did admit she consumed alcohol with a friend a few months before the administrative hearing, but she claims she has otherwise abstained from alcohol and drugs.  Tr. 509.

Tr. 214, 504.  She lost consciousness during the latest of these beatings, which reportedly lasted over five hours and resulted in her ex-boyfriend's incarceration for over two years.  Tr. 214, 504, 506.  More recently, Andrews was severely beaten by an unknown assailant who attacked her when she was walking alone at night.  Tr. Tr. 214-15, 506.  The man repeatedly stomped on her face until she lost consciousness, attempted to drag her to a secluded location, but suddenly stopped and ran away, allowing her to crawl to safety.  Tr. 215, 288, 506.  Andrews claims she still experiences flashbacks and nightmares concerning the incident and still refuses to venture outside alone in the dark.  Tr. 215, 288, 520-24.  Indeed, Andrews claims she fears public places and open spaces, regardless of the time of day, and consequently she finds it difficult to leave the comfort and safety of her apartment.[4]  Tr. 216, 301.

Andrews attended school until the seventh grade.  Tr.

---

[4] At the administrative hearing, Andrews testified that her history of being a victim of physical and sexual abuse has led her to fear and distrust men, and she specifically noted that "My life is going to change because there are no boys or men allowed in my apartment . . . that's my rule."  Tr. 510. She claims she spends most of her day in her apartment and does not leave there unless accompanied by her friend and next door neighbor, Shirley, who prepares most of her meals.  Tr. 517-18, 520.

216, 310, 518.  She received a typical classroom education during the initial stages of her education, but she eventually received special education due to learning problems.  Tr. 518. She obtained her high school equivalency diploma (GED) in 1981.[5]  Tr. 25, 216, 310, 501, 518.  The record reflects Andrews worked for 73 different employers between 1977 and 2005.  Tr. 23, 66-83.  She has worked as a waitress, fast food worker, and residential care aid.  Tr. 497.  Andrews was single and living alone in an apartment at the time of the administrative hearing, however the record reflects she has been homeless in the past and has lived at various shelters. Tr. 255-56, 265-66, 268, 501, 503.  She receives food stamps and relies on her mother and daughter for financial support. Tr. 503.  She can legally drive but does not own a car.  Tr. 503.

In her September 2004 applications for DIB and SSI, Andrews alleged she became disabled beginning January 1, 2004, due to paranoid schizophrenia, depression, paranoia, fear, post-traumatic stress disorder (PTSD), legs and left knee giving out, and pain in her left arm and shoulder.  Tr. 96,

_____

[5] Andrews testified she found the GED testing battery difficult and in fact had failed to achieve the minimum passing score on her first attempt.  Tr. 518-19.

5

139, 153. The Commissioner of the Social Security Administration (SSA) denied her application and Andrews sought review by an ALJ. After holding a hearing on April 2, 2007, the ALJ determined Andrews had the following combination of severe impairments: depression, anxiety, history of polysubstance abuse, and arthritis.[6] Tr. 19. The ALJ further determined, however, that Andrews did not have an impairment or combination of impairments listed in or medically equal to one contained in 20 C.F.R. pt. 404, subpt. P, app. 1. Id. The ALJ determined Andrews "has the residual functional capacity [(RFC)] to perform unskilled light work that is routine, repetitive in nature with no goal setting, no job changes, a SVP of 1 or 2, and only brief/superficial social interaction." Tr. 19. The ALJ found that although Andrews' impairments would preclude her from performing her past relevant work as a waitress, they would not prevent her from performing other work existing in significant numbers in the national economy, such as the jobs of production activity assembler, hand packager, and housekeeper/cleaner. Tr. 24-26. Accordingly, the ALJ found Andrews was not disabled. Tr. 17,

---

[6] Regarding her claim for DIB, Andrews remains insured through June 30, 2009, and must therefore establish disability on or before that date to be entitled to DIB. Tr. 17, 18.

26. Review of the ALJ's July 2007 decision was denied by the SSA's Appeals Council, making it the final decision of the Commissioner. Tr. 5-7. Andrews now seeks review of the ALJ's decision by this Court.

## II.  LAW AND ANALYSIS

In reviewing this case, this Court is required to determine whether the ALJ's findings are supported by substantial evidence on the record as a whole. <u>See</u> 42 U.S.C. § 405(g); <u>Ramirez v. Barnhart</u>, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance of the evidence, but it is enough that a reasonable mind would find it adequate to support the ALJ's decision. <u>See</u> <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1147 (8th Cir. 2001). As long as there is substantial evidence in the record that supports the ALJ's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome or because the Court would have decided the case differently. <u>See</u> <u>Haley v. Massanari</u>, 258 F.3d 742, 747 (8th Cir. 2001). If, after reviewing the record, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed.

See <u>Young v. Apfel</u>, 221 F.3d 1065, 1068 (8th Cir. 2000). Still, in reviewing the record this Court must remain mindful of the ALJ's "duty to develop the record fully and fairly" in the non-adversarial administrative proceeding. <u>Snead v. Barnhart</u>, 360 F.3d 834, 838 (8th Cir. 2004); <u>Stormo v. Barnhart</u>, 377 F.3d 801, 806 (8th Cir. 2004).

In reaching her conclusion that Andrews could perform the unskilled work indicated by the vocational expert, the ALJ (1) gave little weight to Andrews' allegations that her mental and physical impairments were severe enough to preclude her from working; (2) found that Andrews' spotty work history and limited lifetime earnings reflected a lack of motivation to work and served as a substantial inducement to allege disabling symptoms; (3) gave little weight to the conclusion of Lucille Swalve, LISW, a mental health therapist, that Andrews was disabled because of her mental and physical limitations; and (4) gave no weight, and in fact ignored, the conclusions of Dr. Denise Marandola, Ph.D., a psychologist, that Andrews suffers from severe depression, despite her current antidepressant medications, and would find it difficult to perform certain basic work-related activities due to her depression and other mental limitations.

At the outset, the Court disagrees that substantial

8

evidence in the record as a whole supports the ALJ's conclusion that Andrews' complaints are based on her lack of motivation to work, as opposed to being disabling. There is simply no medical evidence in the record to support this view. On the contrary, Andrews' history of physical and sexual abuse, drug and alcohol abuse, severe and chronic depression, and major medical impairments, all point to the conclusion that her complaints are real rather than feigned.

The medical evidence in this case fully supports a disability finding. Andrews is eligible for benefits because she suffers from, among other things, posttraumatic stress disorder (PTSD) and depression pursuant to diagnostic guidelines.[7] The record reflects Andrews has struggled with mental disorders most of her life. Nearly every medical professional in this record who has evaluated Andrews' mental health has diagnosed her with depression and PTSD or affirmed such diagnoses. See, e.g., Tr. 324, 332, 344, 360, 427.[8] Her

---

[7] Although the record shows Andrews may suffer from other serious impairments, including schizophrenia, anxiety, degenerative joint disease, and shoulder problems (see, e.g., Tr. 219-22, 476), the medical evidence concerning PTSD and depression alone provide ample support for a finding of disability, so Andrews' other conditions need not be fully addressed.

[8] Only Sharon Smits, Licensed Independent Social Worker (LISW), failed to recognize Andrews' depression. Ms. Smits

medical records show she has difficulty concentrating and is easily distracted, she experiences hallucinations and is suspected of suffering from paranoia, she is emotionally unstable and may have experienced episodes of decompensation, she has poor judgment, and she frequently becomes involved in activities or situations that have a high probability of painful consequences which she does not recognize. The records further reflect that Andrews' mental impairments have resulted in significant restrictions in her daily activities and marked difficulties in maintaining social functioning. Andrews has been prescribed a litany of psychiatric medications, but no combination of medications has proven effective in completely controlling her mental impairments.

---

diagnosed Andrews with generalized anxiety disorder and PTSD and assessed her with a Global Assessment of Functioning (GAF) of 50 (Tr. 330), reflecting a serious limitation on her ability to perform basic life tasks. Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th ed. Am. Psychiatric Ass'n 1994). However, Smits' notes reflect that Andrews "came only to her intake session, and did not show up for a subsequent session" (Tr. 330), suggesting her assessment of Andrews' mental health is less than complete. Only Verna Halligan, LISW, and Keith Sutherland, LISW, failed to recognize Andrews' PTSD. Ms. Halligan saw Andrews twice and diagnosed her with depression, anxiety, and "Psychotic Disorder, NOS." Tr. 316, 322. Halligan found Andrews' GAF was 48 at the time of her first assessment in September 2003 and 45 at her second in October 2004. Tr. 316, 323. Mr. Sutherland diagnosed Andrews with depression and anxiety and, like Halligan, found Andrews' GAF in September 2003 was 48. Tr. 324.

Dr. Denise Marandola, Ph.D., a Licensed Psychologist to whom Andrews was referred for a consultative examination in 2004, reported that Andrews suffered from polysubstance dependence; post traumatic stress disorder, chronic; major depressive disorder, recurrent, severe; and agoraphobia with panic attacks. Tr. 218. She found Andrews would have difficulty (1) remembering and understanding instructions, procedures, and locations "due to her current level of depression and anxiety, which involves distractibility;" (2) carrying out instructions and maintaining concentration if distractions were present; (3) interacting appropriately with supervisors, coworkers, and the public due to posttraumatic stress and agoraphobia symptoms; and (4) using good judgment, given her history of poor judgment concerning drug and alcohol abuse and her tendency to choose abusive partners.[9] Tr. 218. Dr. Marandola found Andrews scored a total of 30 on the Beck Depression Inventory-II (BDI-II), indicating severe depression, despite her current antidepressant medications. Tr. 217. Finally, Dr. Marandola found Andrews' Global

---

[9] As for her assessment of Andrews' ability to respond appropriately to changes in the workplace, Dr. Marandola was somewhat ambivalent, noting that despite her history of poor judgment Andrews "appears to have responded appropriately to change in a work environment[] in the past." Tr. 218.

Assessment of Functioning (GAF) was 44 (Tr. 218), indicating "[s]erious symptoms . . . or any serious impairment in social, occupational or school functioning . . . ." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th ed. Am. Psychiatric Ass'n 1994); see also Brueggemann v. Barnhart, 348 F.3d 689, 695 (8th Cir. 2003) (noting a GAF score of 50 reflects a serious limitation on a claimant's ability to perform basic life tasks; VE testified that an individual with a GAF score of 50 could not work). Dr. Marandola's opinion is favorable to Andrews' claim and is consistent with the medical evidence from her treating sources.

Dr. Marandola's opinion is in all material respects consistent with the opinions of Andrews' mental health therapist, Lucille Swalve, LISW, who has treated Andrews on a regular basis since 2004 through the Siouxland Mental Health Center outpatient program.[10] Docket No. 9 at 2. In the "Medical Source Statement" completed by the mental health therapist, Ms. Swalve indicated Andrews was "seriously limited"[11] in her capacity to regularly and consistently

---

[10] Andrews began attending Intensive Psychiatric Rehabilitation (IPR) on an outpatient basis on October 10, 2006. Tr. at 25.

[11] The form defines "seriously limited" as "[s]evere loss of ability to perform the named activity in regular,

perform all but two of the basic work-related mental
activities listed on the form. Tr. 334-35. Swalve went on to
explain that Andrews' mental impairments resulted in
"difficulty [in] making sense of instructions [and] . . .
concentrating" and caused her to cry at work on past
occasions. Tr. 335. At the administrative hearing, Swalve
testified Andrews' mental impairments significantly limited
her ability to concentrate and remember information. Tr. 535-
36. Swalve further testified that, although remaining
abstinent from drugs and alcohol had made Andrews' life
somewhat less chaotic, she would nevertheless continue to
experience mental instability for the foreseeable future given
"the [effects] of all the abuse that this woman has suffered."
Tr. 536-37.

The records of Andrews' other treating and examining
mental health providers at the Siouxland Mental Health Center
show Ms. Swalve and Dr. Marandola were not alone in their view
that Andrews suffers significant mental impairments. In 2001,
Dr. Ronald Brink, M.D., a psychiatrist, noted "[Andrews] seems
to have limited insight into her difficulties." Tr. 332. Dr.

_____

competitive employment and, at best, could do so only in a
sheltered work setting where special supervision,
considerations and attention are provided." Tr. 334.

Brink diagnosed her with major depressive disorder, moderate to severe, recurrent, and PTSD and found her GAF was 50.  Id. In 2004, Laurie Warren, a certified physician assistant (PA-C), diagnosed the patient with depression, PTSD, and polysubstance dependence, sustained full remission.  Tr. 360. Ms. Warren found Andrews to be "extremely anxious [and] nervous" during a mental status examination and noted she was "having active auditory individual hallucinations" and displaying "paranoid type thinking."  Tr. 311.  Although Warren found Andrews had a GAF of 58,[12] a lower score would seem appropriate, given Ms. Warren's stated observations of Andrews' extremely distressed state, and also given that another medical professional at the clinic found Andrews had a GAF of 45 just one day earlier.[13]  Tr. 316.  That medical professional, Verna Halligan, LISW, had previously found Andrews had a GAF of 48 in 2003.  Tr. 323.  In her notes concerning her 2004 evaluation of Andrews, Ms. Halligan

_____

[12] A GAF between 51 to 60 indicates "**Moderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning**."  DSM-IV at 32 (emphasis in original).

[13] The GAF score of 45 merits greater deference for the additional reason that the psychiatric assessment with which it is associated is by far more thorough and objectively supported than the assessment associated with the higher GAF score.  Compare Tr. 309-311 (finding GAF of 58) with Tr. 312-317 (finding GAF of 48).

observed Andrews was anxious, fidgety, and at times tearful. Tr. 314. She found her judgment and insight were limited and noted Andrews reported hearing voices. Tr. 314-15. Consistent with the foregoing, the records of the remaining treating sources reflect Andrews suffers significant mental impairments. See, e.g., Tr. 330 (Sharon Smits, Licensed Master Social Worker [LMSW], in 2001 finding Andrews' concentration, memory, and judgment poor and her insight limited, assessing GAF of 50), 324 (Keith Sutherland, LISW, in 2004 finding GAF of 48).[14]

In her decision, the ALJ referenced some of Ms. Warren's notes, but the bulk of her discussion of the evidence concerning Andrews' mental impairments was dedicated to discrediting Ms. Swalve's opinion that these impairments rendered Andrews disabled. The ALJ did not mention any of the other records discussed above. Regarding her rationale for

---

[14] From September 2003 to March 2004, Andrews voluntarily participated in substance abuse treatment. Upon admission her GAF was found to be 42; her GAF was found to be 60 upon discharge. Tr. 210, 212. Factors other than successful completion of the program likely account for the significant discrepancy between these figures. The GAF of 42 was made by the therapist assigned to Andrews' case shortly after Andrews was admitted into the program. Tr. 212-13. The GAF of 60, on the other hand, was made by a different therapist who, nearly three months after Andrews had been discharged, arrived at the figure following her review of Andrews' case record. Tr. 210.

rejecting Swalve's opinion, the ALJ first noted that Swalve is not an "acceptable medical source" under 20 C.F.R. §§ 404.1513 and 416.913, but her opinion would nevertheless be considered under Social Security Ruling 06-3p. Tr. 24. The ALJ then appeared to reject the Medical Source Statement completed by Swalve, complaining both that its rating scale failed to precisely correspond to the scale used by the Social Security Administration for rating the degree of functional limitations resulting from mental disorders, and that its section for listing the symptoms and signs accompanying a diagnosis for affective disorder "appear to be that for [a] bipolar disorder, but from January 2000 through January 2007, the diagnostic impressions have been either major depressive disorder or depressive disorder NOS." Tr. 24. The ALJ also stated "[Swalve] ignores [Andrews'] babysitting, her attendance at the Y, and her attendance at IPR, activities that are inconsistent with the [Medical Source Statement]." Id. Finally, the ALJ observed Swalve "has never hospitalized [Andrews]," and in fact had reduced the frequency of their appointments to once every three weeks in 2005. Id. Although the ALJ noted that Swalve testified at the hearing, her decision did not summarize or specifically address this testimony.

The ALJ's discussion of the evidence concerning Andrews'
mental impairments is deficient in several respects.  As noted
above, although the ALJ referenced some of Ms. Warren's notes
and addressed Ms. Swalve's written assessment, her decision
made no mention of any of the other evidence concerning
Andrews' mental impairments.  This evidence established that
her mental impairments would significantly interfere with her
ability to work and thus should not have been ignored by the
ALJ.  This evidence, moreover, documented GAF scores between
44 and 50 on multiple occasions, indicating serious symptoms
or a serious impairment in social or occupational functioning.
See DSM IV at 32.[15]  The Court finds these scores highly
relevant to this case.  See Brueggemann v. Barnhart, 348 F.3d
689, 695 (8th Cir. 2003) (noting the import of the claimant's
GAF score).[16]  The failure of the ALJ to even acknowledge these

───────────────

[15] This evidence contained only one GAF score in the
moderate range, but as noted above this score is entitled to
less weight than the GAF of 45 found just a day earlier.  See
supra footnote 13 and accompanying text.

[16] It does not matter that some of these scores were
assessed prior to Andrews' alleged onset date; the scores are
all still valuable as "longitudinal evidence."  20 C.F.R. Pt.
404, Subpt. P, App. 1, 12.00(D)(2) ("Proper evaluation of your
impairment(s) must take into account any variations in the
level of your functioning in arriving at a determination of
severity over time.  Thus, it is vital to obtain evidence from
relevant sources over a sufficiently long period prior to the
date of adjudication to establish your impairment severity.");

GAF scores in her summary of Andrews' mental health history highlight her corresponding failure to properly state Andrews' mental residual functional capacity in the hypothetical questions relied upon in her decision. See 20 C.F.R. § 404.1545 (to determine RFC, ALJ must consider all relevant evidence, including medical opinions and facts, physical and mental abilities, non-severe impairments, and claimant's subjective evidence of symptoms).

The ALJ's decision is also seriously deficient in its evaluation of the Medical Source Statement completed by Ms. Swalve. Although the ALJ was correct that SSR 06-3p required her to consider Ms. Swalve's assessment as that of an "other source," her review of the assessment falls far short of satisfying the requirements of this regulation. Ms. Swalve has seen Andrews more than any other treating source in the record and her treatment notes and testimony provide ample support for her assessment. See Ribar v. Barnhart, 199 F. Supp. 2d 917, 921 (S.D. Ia. 2002) (ALJ should have considered social worker's opinion where she had been treating the claimant on a regular basis for more than one year, arguably placing her in a better position to evaluate the claimant's

see Walker v. Apfel, 141 F.3d 852, 854 (8th Cir. 1998) (recognizing ALJ properly looked to longitudinal evidence).

day-to-day condition than two licensed psychiatrists). Her
assessment was therefore entitled to great weight under SSR
06-03p, as it provides highly relevant evidence concerning
both the severity of, and the functional limitations resulting
from, Andrews' mental impairments. This is especially true
given that her assessment is consistent with other medical
evidence in the record, including the opinions of "acceptable
medical sources" such as Dr. Marandola.[17]

As for the ALJ's complaint that the rating scale utilized
by the form on which Swalve's written assessment appeared
failed to precisely correspond to the scale used by the Social
Security Administration for rating the degree of functional

---

[17] The ALJ appeared to base her rejection of Ms. Swalve's
written assessment in part on the fact that her bipolar
diagnosis had never been confirmed by "a licensed physician or
psychologist." Tr. 24. While it is true that no other
acceptable medical source formally diagnosed Andrews with
bipolar disorder, Andrews' treating physician, Dr. Ann Pick,
did at least suspect Andrews suffered from the condition. See
Tr. 261 (stating Andrews "may need some medication for anxiety
and/or *be assessed for bipolar disorder*.") (emphasis added).
In any event, because Ms. Swalve's opinion was offered to
provide insight into the severity of Andrews' mental
impairments and how they affect her ability to function,
rather than to establish the existence of these impairments in
the first instance, this perceived misdiagnosis did not
provide the ALJ an adequate basis for discounting Swalve's
assessment. See 20 C.F.R. § 404.1513(a), (d) (while opinions
of "other" sources cannot be used to establish presence of
medically determinable impairment, such opinions are relevant
to show severity of impairment and how it affects claimant's
ability to work).

limitations resulting from mental disorders, the Court struggles to grasp how the clear implication of Ms. Swalve's responses — that Andrews' mental capacity to work is significantly limited — was somehow obscured by any inconsistency between these rating scales. In any event, Andrews should not have been faulted for the ALJ's own failure to seek clarification from Swalve on this matter during the administrative hearing.

The ALJ's other reasons for discounting Swalve's opinions also miss the mark. The ALJ found Swalve's opinion was entitled to less weight because it failed to account for Andrews' "babysitting, her attendance at the Y[MCA], and her attendance at IPR," activities the ALJ found "inconsistent with the opinion." Tr. 24. But there is no indication Swalve ignored these activities in rendering her opinions. On the contrary, Swalve's extensive treatment notes document these activities and their relevance to Andrews' ongoing treatment far more thoroughly than any other portions of the record. The ALJ also found these activities inconsistent with Andrews' allegations of disabling mental impairments. Tr. 22-23. This finding is not reflective of the record before the ALJ. "IPR" stands for *Intensive Psychiatric Rehabilitation*, a therapeutic program to which Andrews was referred by mental health

providers. Similarly, Andrews' attendance at the YMCA was recommended for physical therapy. As for her babysitting, the record shows Andrews' mental impairments made it difficult for her to refuse her daughter's demands that she watch her grandchildren, but with the encouragement of Ms. Swalve she eventually did. <u>See</u> Docket No. 9-1 at 14. The ALJ's reliance on these activities to discredit Andrews and discount the opinions of Swalve was therefore misplaced.

Undeniably, the ALJ also failed to follow the "special technique" for evaluating mental impairments outlined in 20 C.F.R. § 404.1520a. In the Government's brief, the Court is told this error will be corrected upon remand. Docket No. 10-1 at 6. However, based upon the Court's review of the record, and having given due deference to the ALJ's findings, the Court can discern no reason for delaying this case further. The clear weight of the evidence overwhelmingly points to a conclusion that Andrews is disabled.[18] <u>Hutsell v. Massanari</u>, 259 F.3d 707, 714 (8th Cir. 2001) ("'Where further hearings would merely delay receipt of benefits, an order granting

---

[18] The Court notes the VE testified that, if Andrews' testimony were considered credible, "she would not be able to function." Tr. 543. The VE further testified that, if the functional limitations in Ms. Swalve's written assessment were credited, Andrews would not be capable of competitive employment. Tr. 543-44.

benefits is appropriate.'" (quoting <u>Parsons v. Heckler</u>, 739 F.2d 1334, 1341 (8th Cir. 1984)).

### III.   CONCLUSION

**IT IS THEREFORE HEREBY ORDERED**, pursuant to sentence four of 42 U.S.C. § 405(g), that the decision of the ALJ is **REVERSED**, and the Commissioner is directed to compute and award disability benefits to Andrews with an onset date of October 14, 2004.[19] The Government's motion to remand the case to take further evidence (Docket No. 8) is **DENIED**.

Application for attorney fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 (EAJA), must be filed within thirty (30) days of the entry of final judgment in this action.  Thus, unless this decision is appealed, if Andrews' attorney wishes to apply for EAJA fees, then she must do so within thirty (30) days of the entry of the final judgment in this case.

---

[19] The Court is persuaded that the medical evidence indicates that by this date Andrews' mental health had deteriorated to the point that she could not engage in competitive employment on a sustained basis.  <u>See, e.g.</u>, Tr. 226-7, 312.  No medical evidence demonstrates subsequent improvement sufficient to enable Andrews to engage in such work on a sustained basis.  The Court finds, therefore, that as of this date Andrews was disabled.

**IT IS SO ORDERED** this 13th day of August, 2010.

_____
Donald E. O'Brien, Senior Judge
United States District Court
Northern District of Iowa